## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENNSYLVANIA PROFESSIONAL LIABILITY JOINT UNDERWRITING ASSOCIATION,** | : | **CIVIL ACTION NO. 1:17-CV-2041** |
| | : | |
| | : | **(Chief Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TOM WOLF, in his Official Capacity as Governor of the Commonwealth of Pennsylvania,** | : | |
| | : | |
| | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

On October 30, 2017, defendant Tom Wolf, in his capacity as Governor of the Commonwealth of Pennsylvania, signed into law Act 44 of 2017 ("Act 44 or the Act"), No. 44, 2017 Pa. Laws __ (Oct. 30, 2017). The Act, *inter alia*, mandates that the Pennsylvania Professional Liability Joint Underwriting Association ("Joint Underwriting Association" or "Association") transfer $200,000,000 of its "surplus" funds for deposit into the Commonwealth's General Fund by Friday, December 1, 2017. Act 44 includes a "sunset" provision abolishing the Association should it fail to comply with the December 1 deadline. The Association moves the court to enjoin enforcement of Act 44.

## I.    __Background__

The Joint Underwriting Association commenced this action with the filing of a verified complaint[1] on November 7, 2017.  The Association challenges the constitutionality of Act 44 pursuant to 42 U.S.C. § 1983.[2]  In its complaint, the Association asserts that Act 44 violates the Substantive Due Process Clause (Count I), the Takings Clause (Count II), the Contract Clause (Count III), and the doctrine of unconstitutional conditions (Count IV).[3]  The Association also asserts a claim for declaratory and injunctive relief pursuant to Section 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201 (Count V).[4]

On November 8, 2017, the Association filed the instant motion[5] for a temporary restraining order and preliminary injunction.  The court denied the request for temporary restraining order and scheduled an expedited hearing on the request for a preliminary injunction.[6]  On November 13, 2017, the General Assembly of the Commonwealth of Pennsylvania ("General Assembly") moved for leave to intervene both as of right and on a permissive basis under Federal Rules of Civil Procedure 24(a) and 24(b).[7]  The court granted the motion pursuant to Rule 24(b), finding that the General Assembly had established an adequate basis for permissive intervention.[8]

---

[1] Doc. 1.
[2] *Id.*
[3] *Id.* at 19-26.
[4] *Id.* at 26-27.
[5] Doc. 6.
[6] Doc. 12.
[7] Doc. 17.
[8] Doc. 28.

The court convened a preliminary injunction hearing on November 14, 2017, taking evidence in the form of documentary exhibits and witness testimony. The parties filed proposed findings of fact and conclusions of law in support of their respective positions subsequent to the hearing.[9]  With briefing concluded and the record closed, the Association's motion for preliminary injunction is ripe for disposition.

## II.    **Findings of Fact**[10]

The General Assembly created the Joint Underwriting Association in 1975 in response to a "hard market"[11] for medical malpractice insurance in the Commonwealth.[12]  The Association was established and organized under the Pennsylvania Health Care Services Act, No. 111, 1975 Pa. Laws 390 (Oct. 15, 1975).

---

[9]  Docs. 38, 39, 40.

[10] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the record.  Citations to the record include the transcript of the preliminary injunction hearing convened on November 14, 2017 ("Tr."), as well as exhibits introduced by the Association ("Assoc. Ex.") and Governor Wolf ("Gov. Ex."). During the hearing, the court deferred ruling on Governor Wolf's objection to admissibility of various letter attachments to the Association's Exhibit 1.  *See* Assoc. Ex. 1, Exs. B, C.  Because neither attachment is necessary to the court's disposition of the instant motion, the Governor's objection is rendered moot.

[11] The cyclical nature of insurance markets is described in academic literature as follows: "Property/liability insurance markets alternate between hard and soft markets in a phenomenon known as the underwriting cycle.  In soft markets, underwriting standards are relaxed, prices and profits are low, and the quantity of insurance increases.  In hard markets, underwriting standards become restrictive, and prices and profits increase.  There are many policy cancellations or non-renewals, and policy terms (deductibles and policy limits) are tightened as the quantity of insurance coverage generally decreases."  Seungmook Choi et al., *The Property/Liability Insurance Cycle: A Comparison of Alternative Methods*, 68 S. ECON. J. 530, 530 (2002).

[12] Doc. 38 at 6 ¶¶ 9-10; Doc. 40 ¶¶ 21-22.

The General Assembly repealed the Health Care Services Act on March 20, 2002,

enacting in its stead the Medical Care Availability and Reduction of Error

("MCARE") Act, 40 PA. STAT. ANN. § 1303.101 *et seq*.

The MCARE Act explicitly retains the Joint Underwriting Association.[13]

Specifically, the MCARE Act provides:

> There is established a nonprofit joint underwriting
> association to be known as the Pennsylvania Professional
> Liability Joint Underwriting Association. The joint
> underwriting association shall consist of all insurers
> authorized to write insurance in accordance with section
> 202(c)(4) and (11) of the act of May 17, 1921 (P.L. 682, No.
> 284), known as The Insurance Company Law of 1921 . . . .[14]

The law provides that the Association shall be "supervised by" the Insurance

Department of the Commonwealth ("the Department") but that its "powers and

duties . . . shall be vested in and exercised by a board of directors."[15]

## A.  The Association's Operations, Finances, and Relationship with the Commonwealth

The Association's statutory purpose is to provide coverage to health care

providers who cannot "conveniently" acquire medical malpractice insurance at

rates comparable to similarly-situated providers.[16]  According to the Association,

there are four principal types of health care providers who struggle to obtain

coverage at competitive market rates: (1) providers with a history of malpractice

claims; (2) providers who practice a high-risk specialty; (3) professionals who have

gaps in coverage; or (4) those providers who reenter the profession after loss or

---

[13] *See* 40 PA. STAT. ANN. § 1303.731(a).
[14] *Id.*
[15] *Id.*
[16] *Id.* §§ 1303.731(b)(3), -.732(a).

4

suspension of license or voluntary withdrawal from practice.[17]  Membership in the

Association is mandatory for all insurers authorized to write medical malpractice

insurance policies in the Commonwealth.[18]  Currently, there are 621 member

companies in the Association.[19]

The Association operates pursuant to a Plan of Operations ("the Plan").[20]

Development of the Plan is a requirement under the MCARE Act, and the Plan is

subject to approval by the Commissioner of the Department ("the Insurance

Commissioner").[21]  The Plan establishes a 14-member governing board of directors

consisting of the current president of the Association; eight designees of member

companies chosen by cumulative voting among Association members; one agent or

broker elected by Association members; and four health care provider or general

public representatives.[22]  The four health care provider or general public

representatives may be nominated by anyone and are appointed by the Insurance

Commissioner.[23]  The Plan provides that the Association may be dissolved (1) "by

operation of law" or (2) at the request of the Association's members, subject to the

Insurance Commissioner's approval.[24]  The Plan also provides that "[u]pon

dissolution, all assets of the Association, from whatever source, shall be distributed

---

[17] Doc. 7 ¶ 9.
[18] 40 PA. STAT. ANN. § 1303.731(a).
[19] Tr. 36:22-24.
[20] Doc. 38 at 8 ¶ 16; *see also* Doc. 39 ¶ 5; Doc. 40 ¶¶ 30-33.
[21] *See* 40 PA. STAT. ANN. § 1303.731(b)(1).
[22] Doc. 38 at 8 ¶¶ 16-17; *see also* Doc. 7-1 at 3-4; Doc. 40 ¶ 24.
[23] Doc. 38 at 8 ¶ 17; Doc. 40 ¶ 24.
[24] Doc. 7-1 at 10; *see also* Doc. 39 ¶ 10 & n.3; Doc. 40 ¶¶ 35-36.

in such manner as the Board may determine subject to the approval of the [Insurance] Commissioner."[25]

The Association is organized as a nonprofit association and is federally registered as tax-exempt pursuant to 26 U.S.C. § 501(c)(6).[26] Susan Sersha ("Sersha"), the Association's current president and chief executive officer, testified that the Association has operated in the same manner as a private insurance company since its inception.[27] Its staff are not paid by the state and are not part of the Pennsylvania State Employees' Retirement System.[28] The Association leases real estate in its own name without Commonwealth involvement or approval.[29] The Association retains its own legal counsel and has never been represented by Commonwealth attorneys.[30] Sersha testified that, prior to October 30, 2017, the Commonwealth never treated the Association as a state agency or instrumentality.[31]

The Association is funded exclusively by policyholder premiums and investment income generated from those premiums.[32] These premiums are paid to the Association by medical providers in exchange for the Association's acceptance of considerable insurance risk.[33] The Association has never received state funding.[34] The Association's assets are not held in the state treasury or in any other

---

[25] Doc. 7-1 at 10; Doc. 39 ¶ 11; Doc. 40 ¶ 86.
[26] *See* Tr. 39:11-21.
[27] *See id.* at 39:22-40:2, 40:13-15; 40:22-25, 52:21-53:2.
[28] *Id.* at 41:14-24.
[29] *See id.* at 41:25-42:5.
[30] *Id.* at 42:17-25; Doc. 7 ¶ 29.
[31] *See* Tr. 40:16-21; *cf.* 40 PA. STAT. ANN. § 1303.731-.733.
[32] Tr. 35:2-6, 41:1-3; *see also* Doc. 38 at 10-11 ¶ 28; Doc. 40 ¶ 37.
[33] *See* Tr. at 69:24-70:1.
[34] *Id.* at 41:4-6.

Commonwealth-controlled fund; they are privately held in the Association's own name.[35]

Sersha testified that the Association maintains two pools of assets: the "reserves," which represent funds designated for payment of anticipated claims during the calendar year, and the "surplus," which includes all assets over and above the reserves.[36] She explained that industry standards require an insurance company to maintain a "certain amount" of surplus above its earmarked reserves.[37] The requisite surplus amount varies and is recalculated annually pursuant to an actuarial risk-based capital formula.[38] The surplus serves as a safety net for the insurance company in the event its actuary underestimates claim maturation or other market factors.[39] At the end of the 2016 fiscal year, the Association reported a surplus of $268,124,502.[40]

---

[35] Doc. 7 ¶ 23.

[36] *See* Tr. 21:15-23:3.

[37] *See id.* at 27:21-28:24.

[38] *See id.* at 76:18-77:10, 79:1-5.

[39] *See id.*

[40] Doc. 38 at 20-21 ¶ 69; Doc. 39 ¶ 27. The $268,124,502 figure adopted by the principal parties varies slightly from the $268,124,490 figure identified in the Association's year-end statement of actuarial opinion. *Compare* Doc. 38 ¶ 69 *and* Doc. 39 ¶ 27 *with* Gov. Ex. at 8 *and* Doc. 40 ¶ 42. This discrepancy is *de minimis* and does not impact upon the court's analysis *sub judice*.

## B.    Act 85 of 2016

On July 13, 2016, Governor Wolf signed into law Act 85 of 2016 ("Act 85").[41]

Act 85 is a wide-ranging and lengthy piece of legislation, but its principal effect was

to amend the General Appropriation Act of 2016 and balance the Commonwealth's

budget.[42]  Among other things, Act 85 provides for certain transfers to the

Commonwealth's General Fund.[43]  Pertinent *sub judice*, section 18 of Act 85 requires

a transfer to the General Fund from the Joint Underwriting Association.  The

relevant language states:

> Notwithstanding [the MCARE Act], the sum of
> $200,000,000 shall be transferred from the
> unappropriated surplus of the Pennsylvania Professional
> Liability Joint Underwriting Association to the General
> Fund.  The sum transferred under this section shall be
> repaid to the Pennsylvania Professional Liability Joint
> Underwriting Association over a five-year period
> commencing July 1, 2018.  An annual payment amount
> shall be included in the budget submission required
> under Section 613 of the Act of April 9, 1929 (P.L. 177,
> No. 175), known as the Administrative Code of 1929.[44]

The Association did not transfer funds to the Commonwealth pursuant to Act

85.[45]  On May 18, 2017, the Association commenced a lawsuit—also pending before

the undersigned—challenging the constitutionality of Act 85.[46]  The Association's

lawsuit names as the sole defendant Randy Albright ("Albright") in his capacity

---

[41] *See* Act of July 13, 2016, No. 85, 2016 Pa. Laws __ (July 13, 2016) (codified prior to repeal at 72 PA. STAT. ANN. § 1726-C).

[42] *See id.* § 1.

[43] *See id.* § 1(7).

[44] *Id.* § 18.

[45] *See* Doc. 1 ¶ 27.

[46] *See Pa. Prof'l Liab. Joint Underwriting Ass'n v. Albright*, No. 1:17-CV-886, Doc. 1.

as the Commonwealth's Secretary of the Budget.[47]  Secretary Albright moved to dismiss the Association's complaint on August 22, 2017.[48]  The motion to dismiss is pending, and it only recently became ripe for review.[49]

### C.     Act 44 of 2017

Governor Wolf signed Act 44 into law on October 30, 2017, in another attempt to bring balance to the state budget.[50]  Therein, the General Assembly expressly repeals Act 85.[51]  Among other objectives, Act 44 amends the Commonwealth's Fiscal Code to include "findings" concerning the Joint Underwriting Association's relationship to the Commonwealth and the nature of its unappropriated surplus.[52]  The General Assembly in Act 44 specifically "finds" as follows:

> (1) As a result of a decline in the need in this Commonwealth for the medical professional liability insurance policies offered by the joint underwriting association under [the MCARE Act], and a decline in the nature and amounts of claims paid out by the joint underwriting association under the policies, the joint underwriting association has money in excess of the amount reasonably required to fulfill its statutory mandate.

> (2) Funds under the control of the joint underwriting association consist of premiums paid on the policies issued under [the MCARE Act] and income from investment.  The funds do not belong to any members of the joint underwriting association nor any of the insureds covered by the policies issued.

---

[47] *See id.*, Doc. 12.
[48] *See id.*, Doc. 14.
[49] *See id.*, Docs. 15, 19, 22, 24.
[50] *See* Act 44 of 2017, § 1.
[51] *See id.* § 13.
[52] *Id.* § 1.3.

(3) The joint underwriting association is an Commonwealth. Money under the control of the joint underwriting association belongs to the Commonwealth.

(4) At a time when revenue receipts are down and the economy is still recovering, the Commonwealth is in need of revenue from all possible sources in order to continue to balance its budget and provide for the health, welfare and safety of the residents of this Commonwealth.

(5) The payment of money to the Commonwealth required under this article is in the best interest of the residents of this Commonwealth.[53]

Following these findings, Act 44 mandates the monetary transfer at the heart of this litigation: "On or before December 1, 2017, the joint underwriting association shall pay the sum of $200,000,000 to the State Treasurer for deposit into the General Fund."[54] Per the Act, the funds shall be appropriated by the General Assembly to the Department of Human Services "for medical assistance payments for capitation plans."[55]

Act 44 contains two additional pertinent provisions. Its "no liability" clause purports to immunize both the Association and its officers, board of directors, and employees from liability arising from the transfer mandated by Act 44.[56] The Act also contains a "sunset" clause which threatens to abolish the Association if payment is not made by December 1.[57] That clause states that if the Association does not meet

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

the Act's deadline, the provisions of the MCARE Act creating it will immediately

expire, the Association will be abolished, and its assets will be transferred to the

Insurance Commissioner for administration of the Association's function.[58]  Act 44

then directs the Insurance Commissioner to transfer the $200,000,000 for deposit into

the Commonwealth's General Fund "as soon as practicable after receipt."[59]

## III.  <u>Legal Standard</u>

The court applies a four-factor test in determining the propriety of

preliminary injunctive relief.  The movant must, as a threshold matter, establish

the two "most critical" factors: likelihood of success on the merits and irreparable

harm.[60]  Under the first factor, the movant must show that "it can win on the

merits."[61]  This showing must be "significantly better than negligible but not

necessarily more likely than not."[62]  The second factor carries a slightly enhanced

burden: the movant must establish that it is "more likely than not" to suffer

irreparable harm absent the requested relief.[63]  Only if these "gateway factors" are

satisfied may the court consider the third and fourth factors: the potential for harm

to others if relief is granted, and whether the public interest favors injunctive

relief.[64]  The court must then balance all four factors to determine, in its discretion,

whether the circumstances favor injunctive relief.[65]

---

[58] *Id.*
[59] *Id.*
[60] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.* at 176, 179.
[65] *Id.* at 179.

## IV. **Discussion**

Governor Wolf offers a multifaceted response to the Association's instant motion, invoking both jurisdictional and merits defenses. The General Assembly as intervenor defendant raises similar preliminary challenges.

### A. **Eleventh Amendment Immunity**

Governor Wolf asserts sovereign immunity as a jurisdictional defense to suit. The Eleventh Amendment precludes federal claims for monetary damages against a state and its agencies.[66] This jurisdictional bar applies to agencies of the state and to employees thereof sued in their official capacity.[67]

Eleventh Amendment immunity is not absolute. Its protections are subject to three basic limitations: (1) Congress may specifically abrogate a state's sovereign immunity by exercising its enforcement power under the Fourteenth Amendment; (2) a state may waive its sovereign immunity by consenting to suit; or (3) under *Ex parte Young*, 209 U.S. 123 (1908), a state official may be sued in their official capacity for prospective injunctive or declaratory relief.[68] The Association invokes the third exception, suing Governor Wolf in his official capacity to enjoin enforcement of Act 44.

---

[66] U.S. CONST. amend. XI; *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000); *Lombardo v. Pennsylvania*, 540 F.3d 190, 194-95 (3d Cir. 2008).

[67] *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Hindes v. FDIC*, 137 F.3d 148, 158 (3d Cir. 1998).

[68] *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999); *Kentucky v. Graham*, 473 U.S. 159, 169 n.18 (1985); *Koslow v. Pennsylvania*, 302 F.3d 161, 168 (3d Cir. 2002).

In *Ex parte Young*, the Supreme Court crafted an exemption to state sovereign immunity for cases seeking to enjoin state officials from implementing an unconstitutional state law.[69] The Court emphasized that plaintiffs cannot simply name *any* state official to bypass the Eleventh Amendment.[70] Rather, a named official "must have some connection" to enforcement of the act.[71] Nonetheless, in determining whether *Ex parte Young* applies, a court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[72]

The Third Circuit Court of Appeals has yet to address the "unsettled" question of whether *Ex parte Young* can apply to cases concerning self-enforcing

---

[69] *See Constitution Party v. Cortes*, 824 F.3d 386, 396 (3d Cir. 2016) (quoting *Ex parte Young*, 209 U.S. at 157; *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001)).

[70] *See Ex parte Young*, 209 U.S. at 157.

[71] *Id.*; *Constitution Party*, 824 F.3d at 395-96.

[72] *NCAA v. Governor of N.J.*, 832 F.3d 389, 395 n.3 (3d Cir. 2016) (*en banc*) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)), *cert. granted on other grounds*, 137 S. Ct. 2326 (2017).

or self-executing statutes.[73]  We need not embark on the difficult task of reconciling sovereign immunity with wholly self-executing statutes, because we find that Act 44 is not one.  Certain components of Act 44 are automatic.  If the Association does not make the mandated payment by December 1, 2017, for example, provisions of the MCARE Act establishing the Association automatically "expire."[74]  No state official must direct or take action to ensure implementation or enforcement of this provision.[75]  Thus, were passive repeal of the Association's originating legislation the exclusive achievement of Act 44, we may indeed be faced with a "truly" self-executing statute.[76]

But partial expiration of the MCARE Act is only a prefatory function of Act 44.  The law includes several further—and *affirmative*—requirements.  It mandates that the Association "be abolished."[77]  It also orders that $200,000,000 of the Association's monies "be transferred" to the Commissioner of the Insurance

---

[73] *See id.*  However, the Third Circuit has acknowledged the Sixth Circuit Court of Appeals' treatment of the issue in *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982), *aff'g in relevant part*, 496 F. Supp. 408 (S.D. Oh. 1980).  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1208-09 (3d Cir. 1988).  In *Allied*, the Sixth Circuit affirmed a district court decision allowing litigation to proceed against the governor of Ohio notwithstanding the "self-enforcing" nature of the challenged statute.  *Id.* at 665 & n.5.  The appellate court noted that plaintiffs would have been barred from vindicating a constitutional harm had they not been allowed to name the governor as defendant.  *Id.*  Both the district court and the appellate court further observed that, although the governor had no *explicit* enforcement obligation under the statute, he would inevitably be motivated by "substantial public interest" in the particular legislation to ensure that the law was enforced.  *See Allied*, 679 F.2d at 665 & n.5; *Allied*, 496 F. Supp. at 426-27.

[74] *See* Act 44, § 1.3.

[75] *See id.*

[76] *See NCAA*, 832 F.3d at 395 n.3.

[77] Act 44, § 1.3.

Department immediately upon expiration of the MCARE Act.[78]  These dual objectives are Act 44's *raison d'être*.  Although passive statutory language obscures exactly who must enforce these directives, there is little doubt that *some* state official must act to implement them.[79]

The function of administering and enforcing Act 44 will ultimately fall at the feet of Governor Wolf, either directly in his capacity as chief executive of the Commonwealth,[80] or through directives and delegation to the Insurance Commissioner as a member of his cabinet.[81]  In either event, there is a "realistic potential"—indeed, a virtual certainty—that Governor Wolf will employ his executive authority to ensure transfer of the funds and abolition of the Association in accordance with the Act.[82]  We conclude that the Association has pled an appropriate claim for prospective injunctive and declaratory relief against Governor Wolf to invoke *Ex parte Young* and its progeny.

## B.    Standing

The Governor also oppugns the Association's standing to bring this suit.  Article III, Section 2 of the United States Constitution confers upon federal courts the power to adjudicate "Cases" and "Controversies."[83]  To satisfy the case

---

[78] *Id.*
[79] *Id.*; *see also NCAA*, 832 F.3d at 395 n.3.
[80] *See* PA. CONST. art. IV, § 2.
[81] *See* 71 PA. STAT. ANN. § 61(a).
[82] *See Rode*, 845 F.2d at 1208 (quoting *Allied*, 473 F. Supp. at 568).
[83] U.S. CONST. art. III, § 2.

or controversy requirement, a plaintiff must establish standing.[84]  If a plaintiff fails to meet this burden, the court cannot proceed and must dismiss the action for lack of jurisdiction.[85]

The "irreducible constitutional minimum of standing" requires a plaintiff to establish: (1) an injury in fact, to wit: "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent"; (2) a causal relation between the conduct complained of and the alleged injury; and (3) that it is "likely" rather than merely "speculative" that the requested relief will redress the alleged injury.[86]  With these factors as guideposts, the court must satisfy itself that a litigant has a sufficient "personal stake" in the matter to justify a federal court's exercise of jurisdiction.[87]

Governor Wolf first contends that he is unable to redress the Association's claimed injury.[88]  He intimates that his involvement with Act 44 ended with his signing of the law.[89]  We reject this argument for reasons identified *supra* concerning sovereign immunity.  The Commonwealth's "supreme executive power" rests with Governor Wolf, who is obligated to guarantee faithful execution of the law, and the

---

[84] *See Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982); *Common Cause of Pa. v. Commw.*, 558 F.3d 249, 258 (3d Cir. 2009) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008)).

[85] *See Common Cause of Pa.*, 558 F.3d at 257 (quoting *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006)).

[86] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014) (quoting *Lujan*, 540 U.S. at 560-61).

[87] *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)).

[88] *See* Doc. 39 ¶ 17.

[89] *See id.*

Governor will surely exercise that power to ensure compliance with Act 44's mandates.[90] To enjoin Governor Wolf from either enforcing (or directing enforcement of) Act 44 squarely redresses the Association's impending injury.

Governor Wolf also avers that the Association has no personal interest in the $200,000,000 subject to Act 44.[91] He contends that the funds are designated "surplus" by the Association itself, oppugning the Association's need therefor, and further asserts that the funds do not "belong to" the Association.[92] This argument is inextricably intertwined with the parties' merits arguments and is addressed *infra* at length. For justiciability purposes, it is sufficient that Act 44 threatens immediate abolition of the Association should it decline to turn $200,000,000 over to the Commonwealth by December 1, 2017. Whether this threatened harm is one of constitutional dimension is a merits question which does not impact upon justiciability.

### C.   Legislative Immunity

Governor Wolf invokes legislative immunity in a final attempt to evade merits resolution of the Association's motion.[93] The doctrine of legislative immunity shields legislators for "all actions taken 'in the sphere of legitimate legislative

---

[90] *See* PA. CONST. art. IV, § 2.
[91] *See* Doc. 39 ¶¶ 20-21.
[92] *See* Doc. 18 at 13; Doc. 39 ¶ 21.
[93] *See* Doc. 39 ¶¶ 7-9. The court implicitly rejected this defense during the evidentiary hearing. *See* Tr. 88:21-25, 115:12-19. The court herein expands on its *ratio decidendi* and memorializes its preliminary finding as articulated on the record.

activity.'"[94]  It extends beyond legislators and protects any public officials performing "legislative functions."[95]

Governor Wolf remonstrates that he cannot be held liable for the distinctly legislative act of signing a bill into law.[96]  We agree.  Third Circuit precedent unequivocally establishes that public officials cannot be held liable for advocating or promoting legislation or for signing bills into law.[97]  If the Association sued Governor Wolf solely on the theory that signing Act 44 violated the Constitution, legislative immunity may well apply.  But it did not.  The Association has sued Governor Wolf in anticipation of imminent efforts to *enforce* enacted legislation in a manner which may well implicate constitutional rights.[98]  In this capacity, the Governor is not entitled to legislative immunity.

### D.     Preliminary Injunctive Relief

#### 1.     *Likelihood of Success on the Merits*

To establish a likelihood of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action.[99]  We must examine the legal principles controlling the claim and the potential defenses available to the opposing party.[100]  A mere possibility that the

---

[94] *Baraka v. McGreevey*, 481 F.3d 187, 195-96 (3d Cir. 2007) (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998)).

[95] *Id.* (collecting cases).

[96] Doc. 39 ¶¶ 7-9.

[97] *Baraka*, 481 F.3d at 196-97.

[98] Doc. 1 ¶ 2; *id.* at 27-28; *see* Tr. 115:12-14.

[99] *Punnett v. Carter*, 621 F.2d 578, 582-83 (3d Cir. 1980).

[100] *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000).

claim might be defeated does not preclude a finding of probable success if evidence

clearly satisfies the essential prerequisites of the cause of action.[101]  A showing that is

"significantly better than negligible but not necessarily more likely than not" is

sufficient to obtain preliminary injunctive relief.[102]  The requisite strength of a claim

on the merits depends ultimately on the balance of the harms: "the more net harm

an injunction can prevent, the weaker the plaintiff's claim on the merits can be while

still supporting some preliminary relief."[103]

Section 1983 creates a private cause of action to redress constitutional

wrongs committed by state officials.[104]  The statute is not a source of substantive

rights, but serves as a mechanism for vindicating rights otherwise protected by

federal law.[105]  To state a Section 1983 claim, plaintiffs must show a deprivation of a

"right secured by the Constitution and the laws of the United States . . . by a person

acting under color of state law."[106]  Governor Wolf does not dispute that he is a state

---

[101] *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001).
[102] *Reilly*, 858 F.3d at 179.
[103] *Id.*
[104] *See* 42 U.S.C. § 1983.
[105] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).
[106] *Kneipp*, 95 F.3d at 1204 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

actor.  We must thus assess whether Act 44 potentially deprives the Association of rights secured by the United States Constitution.[107]

The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation.[108]  The Takings Clause is made applicable to the states by the Fourteenth Amendment.[109]  It applies not only to the taking of real property, but also to government efforts to take identified funds of money.[110]  Takings claims generally fall into two categories—physical takings and regulatory takings.[111]  The Association's claim concerns an alleged physical taking.[112]

The Supreme Court in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), established a threshold ripeness element for takings cases.  To proceed on a physical taking claim, a plaintiff must first show that it sought and was denied just compensation using state procedures, assuming

---

[107] The Association seeks preliminary injunctive relief based on all four Section 1983 claims asserted in its verified complaint.  (*See* Doc. 38 ¶¶ 16-39).  A court need only determine that the moving party would likely succeed on one claim to issue injunctive relief.  *See Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 590 (W.D. Pa. 2009); *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 234 (M.D. Pa. 2001).  Because we find that the Association has established a reasonable probability of success on the merits with respect to its Fifth Amendment takings claim, we restrict our analysis to that cause of action.

[108] U.S. CONST. amend. V.

[109] *See* U.S. CONST. amend. XIV; *Murr v. Wisconsin*, 582 U.S. __, 137 S. Ct. 1933, 1942 (2017) (citing *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 266 (1897)).

[110] *See, e.g.*, *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 160, 164-65 (1998); *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155, 164-65 (1980).

[111] *See Yee v. City of Escondito*, 503 U.S. 519, 522-23 (1982).

[112] *See* Doc. 38 at 32-33 ¶ 25; *see also* Doc. 18 at 16-17.

such procedures are both available and adequate.[113]  No such state procedure is available to the Association.[114]  The Commonwealth's Eminent Domain Code[115] provides no procedure for obtaining compensation for personal property.  Nor does Act 44 itself include a reimbursement mechanism.[116]  Indeed, in Act 44, the General Assembly deliberately removed reimbursement provisions contained in the Act's predecessor.[117]  Neither Governor Wolf nor the General Assembly identify an available and adequate state procedure.[118]  Under the circumstances, we are compelled to conclude that the Association's takings claim satisfies threshold ripeness standards.

Governor Wolf asseverates that Act 44 does not effect an unconstitutional taking because the surplus funds are not property of the Association.[119]  He avers that the Association owes its existence to the Commonwealth and suggests that it follows therefrom that the Association's assets unequivocally belong to the sovereign.[120]  Act 44's "finding" that the Association's funds "belong[] to the Commonwealth" rests on this logic.[121]  The Association answers that it is funded

---

[113] *See Knick v. Twp. of Scott*, 862 F.3d 310, 323 (3d Cir. 2017) (citing *Williamson Cty.*, 473 U.S. at 194).

[114] Doc. 38 at 33 ¶ 26.

[115] 26 PA. CONS. STAT. § 101 *et seq.*

[116] *See* Act 44, § 1.3.

[117] *Compare* Act 44, §1.3 *with* Act 85, § 18.

[118] *See* Docs. 39, 40.

[119] Doc. 39 ¶ 40.

[120] *Id.*

[121] *See* Act 44, § 1.3; *see also* Tr. 91:6-93:5.

exclusively by policyholder premiums and investment income and has never received state funding.[122]

The Association has preliminarily demonstrated that Act 44 affects a "legally cognizable property interest" in its surplus funds.[123] The Supreme Court more than three decades ago admonished that a "state, by *ipse dixit*, may not transform private property into public property without compensation."[124] Even if we were to accept as controlling Act 44's finding that the Association is an "instrumentality" of the state—and we do not—that status does not accord *carte blanch* access to the entity's assets.[125]

The General Assembly perceives as dispositive the Pennsylvania Supreme Court's recent ruling in *Hospital & Healthsystem Ass'n of Pennsylvania v. Commonwealth*, 77 A.3d 587 (Pa. 2013), in which the state supreme court held that monies paid into the reserves of the state-run MCARE insurance fund were held in trust for providers who paid into the fund, but that any "surplus" belonged to the state.[126] This decision—which involved a similar legislative acquisition to remedy a prior state budget deficit—concerned ownership interests in monies paid into a statutory "special fund" held *within* the Commonwealth's treasury.[127]

---

[122] *See* Doc. 38 at 10-11 ¶ 28, at 30 ¶ 15.

[123] *See Prometheus Radio Project v. F.C.C.*, 373 F.3d 372, 428 (3d Cir. 2004) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Webb's Fabulous Pharms.*, 449 U.S. at 160-61).

[124] *Webb's Fabulous Pharms.*, 449 U.S. at 164.

[125] *Cf. Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth*, 77 A.3d 587, 603-05 (Pa. 2013).

[126] Doc. 30 at 9; *see also* Doc. 40 ¶ 153.

[127] *Hosp. & Healthsystem Ass'n of Pa.*, 77 A.3d at 592.

The Commonwealth's possessory interest in the funds at issue in *Hospital & Healthsystems* is a key factual distinction from the funds in this case. The Association's funds have never been held in or commingled with Commonwealth dollars.[128]

Counsel for Governor Wolf suggested during the evidentiary hearing that the Association's governing Plan itself establishes that the funds ultimately belong to the Commonwealth.[129] Counsel adjured: "The plan as approved, the plan provides that upon dissolution, whether by law or otherwise, *the money becomes the Commonwealth's*. That's what the plan says. That's what they approved. That's what they voted on."[130] This argument misinterprets the Plan's plain language. Article XI of the Plan, subtitled "Dissolution," provides that "[u]pon dissolution, all assets of the Association, from whatever source, shall be distributed in such manner as *the Board may determine* subject to the approval of the [Insurance] Commissioner."[131] Thus, while the Insurance Commissioner may reject the board's proposed asset distribution, the authority to develop a distribution plan in the first instance is vested in the Association's board.[132]

The surplus held by the Association is comprised singularly of monies paid to it by private healthcare providers in exchange for the Association's acceptance of high level insurance risk.[133] None of the funds in the Association's coffers are

---

[128] *See* Doc. 38 at 11-12 ¶ 32.
[129] *See* Tr. 99:3-13.
[130] Tr. 99:7-13 (emphasis added).
[131] Doc. 7-1 at 10 (emphasis added).
[132] *See id.*
[133] Tr. 35:2-6, 41:1-3, 69:24-70:1.

sovereign dollars in a traditional sense: the Association is not and has never been taxpayer-funded, and it has never otherwise received Commonwealth appropriations.[134] Against this backdrop, the Commonwealth's self-serving "finding" that the Association is a state instrumentality whose funds belong to the sovereign is of no moment.[135] For the limited purpose of obtaining preliminary injunctive relief, the Association has adequately demonstrated a "reasonable probability" of success on the merits.[136]

### 2. *Irreparable Harm*

Irreparable injury is harm of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole.[137] Mere risk of injury is not sufficient to meet this standard. Rather, the moving party must establish that the harm is imminent and probable.[138] Harm that may be contained effectively only through immediate injunctive relief is properly deemed "irreparable."[139]

---

[134] *See* Tr. 35:2-6, 41:1-6, 69:24-70:1; *see also* Doc. 38 at 10-11 ¶ 28; Doc. 40 ¶ 37.

[135] *See Webb's Fabulous Pharms.*, 449 U.S. at 164.

[136] We are mindful that the acts of state legislatures generally enjoy a presumption of constitutionality. Pennsylvania's Statutory Construction Act applies a presumption in all statutory interpretation cases that "the General Assembly does not intend to violate the Constitution of the United States." 1 PA. CONS. STAT. § 1922(3). The presumption does not control in the instant matter because Act 44 is unambiguous and the Commonwealth's stated public intentions are not in dispute.

[137] *See Anderson v. Davila*, 125 F.3d 148, 163-64 (3d Cir. 1997) (citing *Beacon Theatres v. Westover*, 359 U.S. 500, 506-07 (1959)); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).

[138] *Anderson*, 125 F.3d at 164.

[139] *Instant Air Freight*, 882 F.2d at 801.

The Association will lose $200,000,000 on December 1, 2017 if Act 44 takes effect.[140]  Sersha testified that the Association's anticipated harm is not limited to that sum.[141]  Because the Association's surplus is heavily invested, accessing the surplus for transfer will require the Association to liquidate a significant portion of its investment portfolio.[142]  Sersha estimated these transaction costs could run as high as ten percent or $20,000,000.[143]  In addition, the Association will lose prospective investment income on the divested surplus.[144]  All told, the Association faces considerable financial harm.

Moreover, the financial injury wrought by Act 44 is a bell that cannot be unrung.  The Eleventh Amendment bars a retroactive award of damages against state officials.[145]  The General Assembly expressly conceded that, should the Association ultimately prevail on the merits, sovereign immunity would preclude monetary recovery.[146]  Governor Wolf effectively concedes as much but rejoins that there is no irreparable harm because the Association will retain a residual surplus adequate to remain solvent.[147]

This court and others have held that the Eleventh Amendment's insulation of sovereign defendants renders suits for damages "inadequate" to compensate state-

---

[140] *See* Act 44, § 1.3.
[141] *See* Tr. 43:13-44:14.
[142] Doc. 38 at 22-23 ¶ 76.
[143] Tr. 43:14-18.
[144] *See* Doc. 38 at 22-23 ¶ 76.
[145] *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 319 (3d Cir. 2013).
[146] Tr. 108:11-23.
[147] *See* Doc. 39 at 14-15 n.10.

inflicted injuries.[148] In such circumstances, the complete absence of available recompense satisfies the irreparable harm requirement. The court concludes that the impending and uncompensable financial injury to the Association strongly favors preliminary injunctive relief.

### 3. *Remaining Factors*

The public interest generally supports an award of preliminary injunctive relief when a plaintiff has demonstrated both a reasonable probability of success on the merits and irreparable harm.[149] This interest is particularly compelling when the right to be vindicated derives from the United States Constitution.[150] We have no quarrel with the Governor's assertion that the citizens of this Commonwealth have a genuine interest in a balanced state budget, and we are not unsympathetic to the Byzantine intricacies of the General Assembly's budget process.[151] But a sovereign

---

[148] *See Firetree, Ltd. v. Creedon*, No. 1:08-CV-245, 2008 WL 2078152, at *14-15 (M.D. Pa. May 15, 2008) (Conner, J.) (quoting *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991); *Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cty.*, 893 F. Supp. 301, 309 (D.N.J. 1995)).

[149] *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

[150] *See Johnson v. Wetzel*, 209 F. Supp. 3d 766, 781 (M.D. Pa. 2016) (Conner, C.J.) (collecting cases).

[151] During oral argument, counsel for the General Assembly stated: "This is the budget of the Commonwealth of Pennsylvania, and I think the court . . . should tread lightly into the notion of inserting itself into the budgetary process of the Commonwealth of Pennsylvania." (Tr. 105:9-12). Counsel further suggested that issuance of an injunction *sub judice* would encourage future federal litigation over the Commonwealth's budget process. Notwithstanding the obvious difficulties in reaching a budget agreement that crosses the lines of political parties and starkly divergent fiscal philosophies, the court suggests that the main driver of future federal litigation will be the General Assembly's continued efforts to tap non-traditional and legally murky sources of state funding, such as the Association's coffers, which support medical professionals who are in need of liability insurance.

cannot achieve a legitimate end by unconstitutional means. On balance, the public interest favors temporary enjoinder of Act 44.

To determine whether injunctive relief would result in greater harm to the nonmovant, the court must examine the terms of the proposed injunction, consider the parties' respective positions, and assess the ramifications of the requested relief.[152] Injunctive relief should generally be denied if the potential harm to the nonmovant substantially outweighs the potential benefit to be bestowed upon the movant.[153]

The impending harm to the Association is considerable and concrete. Act 44 presents the Association with a Hobson's choice: the Association must make an irreversible transfer of $200,000,000 to the Commonwealth or face immediate abolition.[154] Defendants, *per contra*, identify neither relative harm to the public nor urgent need for the subject funds.[155] Instead, both Governor Wolf and the General Assembly simply entreat the court to refrain from unraveling their resolution of the Commonwealth's latest budget impasse.[156] As the court has already noted, granting the Association's motion merely preserves the status quo.[157] Because the court is prepared to expedite full merits disposition of this matter, Act 44 will be preliminarily enjoined for only a short period of time. In the absence of any

---

[152] *Novartis Consumer Health, Inc. v. Johnson & Johnson—Merck Consumer Pharms., Inc.*, 290 F.3d 578, 596-97 (3d Cir. 2002).
[153] *Id.*
[154] Act 44, § 1.3.
[155] *See generally* Docs. 39, 40.
[156] Doc. 39 ¶ 61; Doc. 40 ¶¶ 164-67.
[157] *See* Tr. 95:24-96:13.

particularized countervailing harm to the defendants, the balance of the respective hardships favors injunctive relief.

## V. Conclusion

The court recognizes that preliminary injunctive relief is an "extraordinary" remedy which should issue only in limited circumstances.[158] The uncompensable constitutional exigency imposed by Act 44 is one of extraordinary proportion. Accordingly, for all of the reasons stated herein, the court concludes that preliminary injunctive relief is necessary *sub judice*.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    November 22, 2017

---

[158] *AT&T*, 42 F.3d at 1426-27; *see also* FED. R. CIV. P. 65.