# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENNSYLVANIA PROFESSIONAL LIABILITY JOINT UNDERWRITING ASSOCIATION,** | : | **CIVIL ACTION NO. 1:17-CV-2041** |
| | : | |
| | : | **(Chief Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TOM WOLF, in his Official Capacity as Governor of the Commonwealth of Pennsylvania,** | : | |
| | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

On October 30, 2017, defendant Tom Wolf, in his capacity as Governor of the Commonwealth of Pennsylvania, signed into law Act 44 of 2017, P.L. 725, No. 44 ("Act 44"). The Act, *inter alia*, mandates that the Pennsylvania Professional Liability Joint Underwriting Association ("Joint Underwriting Association" or "Association") transfer $200,000,000 of its "surplus" funds for deposit into the Commonwealth's General Fund by Friday, December 1, 2017. Act 44 includes a "sunset" provision purporting to abolish the Association should it fail to comply with its deadline. The Association seeks a declaration that Act 44 violates the United States Constitution.

## I.    <u>Factual Background & Procedural History</u>[1]

The Joint Underwriting Association is a nonprofit association organized under the laws of the Commonwealth of Pennsylvania.  (See Doc. 60 ¶ 1; Doc. 72 ¶ 1; Doc. 74 ¶ 1).  The General Assembly created the Association in 1975 in response to a "hard market"[2] for medical malpractice insurance in the Commonwealth.  (See Doc. 63 ¶ 1; Doc. 65 ¶ 2).  The Association was initially established and organized by the Pennsylvania Health Care Services Malpractice Act of 1975, P.L. 390, No. 111 ("Act 111").  The General Assembly repealed Act 111 on March 20, 2002, enacting in its place the Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 PA. STAT. & CONS. STAT. ANN. § 1303.101 *et seq.*

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  <u>Id.</u>  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 60, 63, 65, 72, 74, 76, 77).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] The cyclical nature of insurance markets is described in academic literature as follows: "Property/liability insurance markets alternate between hard and soft markets in a phenomenon known as the underwriting cycle.  In soft markets, underwriting standards are relaxed, prices and profits are low, and the quantity of insurance increases.  In hard markets, underwriting standards become restrictive, and prices and profits increase.  There are many policy cancellations or non-renewals, and policy terms (deductibles and policy limits) are tightened as the quantity of insurance coverage generally decreases."  Seungmook Choi *et al.*, *The Property/Liability Insurance Cycle: A Comparison of Alternative Methods*, 68 S. ECON. J. 530, 530 (2002).

## A. The MCARE Act and the Joint Underwriting Association

The MCARE Act is a sweeping piece of legislation. The Act's overarching goal is to ensure a "comprehensive and high-quality health care system" for the citizens of the Commonwealth. Id. § 1303.102(1). In pursuit of this objective, the Act seeks to guarantee that medical professional liability insurance is "obtainable at an affordable and reasonable cost," to ensure prompt and fair resolution of medical negligence cases, and to reduce and eliminate medical errors. Id. § 1303.102(3)-(5). The Act includes patient safety rules and reporting obligations, see id. §§ 1303.301-.315, establishes requirements relating to reduction and prevention of health care associated infections, see id. §§ 1303.401-.411, and develops standards for medical professional liability litigation and compensation, see id. §§ 1303.501-.516.

The MCARE Act also establishes a Medical Care Availability and Reduction of Error Fund ("the MCARE Fund"). See id. §§ 1303.711-.716. The General Assembly designed the MCARE Fund as a "special fund" within the state treasury to be administered by the Insurance Department of Pennsylvania ("the Department"). Id. §§ 1303.712(a), -.713(a). The Fund provides a secondary layer of medical professional liability coverage for physicians, hospitals, and other health care providers in the Commonwealth. See id. § 1303.711(g). It is funded primarily by annual assessments ("MCARE assessments") on health care providers as a condition of practicing in the Commonwealth. See id. § 1303.712(d)(1).

Additionally, the MCARE Act continues operation of the Joint Underwriting Association. Id. § 1303.731(a). Unlike the MCARE Fund, the General Assembly did not establish the Association as a "special fund" or a traditional agency within the

Commonwealth's governmental structures. See id.; cf. id. §§ 1303.712(a), -.713(a).

Instead, the General Assembly "established" the Association as "a nonprofit joint underwriting association to be known as the Pennsylvania Professional Liability Joint Underwriting Association." Id. § 1303.731(a). Like its predecessor, see Act 111, § 802, the MCARE Act mandates membership in the Association for insurers authorized to write medical professional liability insurance in the Commonwealth, 40 Pa. Stat. & Cons. Stat. Ann. § 1303.731(a). Currently, the Association has 621 member insurance companies. (Doc. 60 ¶ 43).

The Association is charged by statute with offering medical professional liability insurance to health care providers and entities who "cannot conveniently obtain medical professional liability insurance through ordinary methods at rates not in excess of those applicable to [those] similarly situated." 40 Pa. Stat. & Cons. Stat. Ann § 1303.732(a). The MCARE Act sets forth broad parameters for achieving this objective, to wit:

> The [Joint Underwriting Association] shall ensure that the medical professional liability insurance it offers does all of the following:
>
> (1)    Is conveniently and expeditiously available to all health care providers required to be insured under section 711.
>
> (2)    Is subject only to the payment or provisions for payment of the premium.
>
> (3)    Provides reasonable means for the health care providers it insures to transfer to the ordinary insurance market.

(4)     Provides sufficient coverage for a health care
        provider to satisfy its insurance requirements
        under section 711 on reasonable and not unfairly
        discriminatory terms.

(5)     Permits a health care provider to finance its
        premium or allows installment payment of
        premiums subject to customary terms and
        conditions.

Id. § 1303.732(b)(1)-(5).  The Association insures "all comers" who certify that they

cannot obtain coverage at competitive rates.  (P.I. Hr'g Tr. 11:3-13:8; Doc. 60 ¶ 42).

According to the Association, its insureds generally fall into four categories: (1)

providers with a history of malpractice occurrences, (2) providers practicing high-

risk specialties, (3) providers who have gaps in coverage, or (4) providers reentering

the medical profession after loss or suspension of license or voluntary withdrawal

from practice.  (Doc. 60 ¶ 42).

The Association, like other insurers in the Commonwealth, is "supervised"

by the Department through the Insurance Commissioner ("Commissioner").  40

PA. STAT. & CONS. STAT. ANN. § 1303.731(a); see, e.g., id. §§ 221.1-a to -.15-a, 1181-99.

The MCARE Act prescribes four "duties" to the Association.  Id. § 1303.731(b).  It

requires the Association to submit a plan of operations to the Commissioner for

approval.  Id. § 1303.731(b)(1).  It tasks the Association to submit rates and any rate

modifications for Department approval.  Id. § 1303.731(b)(2) (incorporating 40 PA.

STAT. & CONS. STAT. ANN. §§ 1181-99).  It requires the Association to "[o]ffer medical

professional liability insurance to health care providers" as described above.  See

id. § 1303.731(b)(3).  And it directs the Association to file its schedule of occurrence

rates with the Commissioner, which she uses to set a "prevailing primary premium"

for calculating the annual MCARE assessments for all health care providers in the Commonwealth. Id. § 1303.731(b)(4) (incorporating 40 PA. STAT. & CONS. STAT. ANN. § 1303.712(f)). The Act insulates the Commonwealth from the Association's debts and liabilities. Id. § 1303.731(c).

The MCARE Act provides that all "powers and duties" of the Association "shall be vested in and exercised by a board of directors." Id. § 1303.731(a). The board's composition, and all of the Association's operative principles, are set forth in a plan of operations developed by the Association with Department assistance and approval. (Doc. 60 ¶ 44; Doc. 63 ¶¶ 13-16); see also 40 PA. STAT. & CONS. STAT. ANN. § 1303.731(b)(1). The plan establishes a 14-member board of directors, which consists of the current Association president; eight representatives of member companies chosen by member voting; one agent or broker elected by members; and four health care provider or general public representatives who may be nominated by anyone and are appointed by the Commissioner. (Doc. 60 ¶ 45). Under the plan, the Association may be dissolved (1) "by operation of law," or (2) at the request of its members, subject to Commissioner approval. (Id. ¶ 46). The plan provides that, "[u]pon dissolution, all assets of the Association, from whatever source, shall be distributed in such manner as the Board may determine subject to the approval of the Commissioner." (Id. ¶ 47).

The Joint Underwriting Association writes insurance policies directly to its insured health care providers. (See Doc. 63 ¶ 27; Doc. 65 ¶ 19). Policyholders pay premiums directly to the Association. (See Doc. 60 ¶ 65). The Association is funded exclusively by policyholder premiums and investment income. (Id. ¶ 54). It is not

and has never been funded by the Commonwealth, and it holds all premiums and investment funds in private accounts in its own name. (Id. ¶¶ 51, 54, 65-69). The Association currently insures approximately 250 policyholders. (Doc. 63 ¶ 26; Doc. 65 ¶ 20). The typical medical professional liability policy issued by the Association covers a one-year period, with a limit of $500,000 per claim and aggregate limits of $1,500,000 for individuals and $2,500,000 for hospitals. (Doc. 63 ¶ 27).

The Association maintains contingency funds—its "reserves" and its "surplus"—which allow the Association to fulfill its insurance obligations in the event of greater-than-anticipated claims or losses. (See Doc. 60 ¶¶ 108-12). An insurer's "reserves" are the "best estimate of funds . . . need[ed] to pay for claims that have been incurred but not yet paid." (Id. ¶ 109). Its "surplus" represents "capital after all liabilities have been deducted from assets." (Id. ¶ 111). The surplus operates as a "backstop" to ensure that unforeseen events do not impede an insurer's ability to meet obligations to its insureds. (Id. ¶ 112). As of December 31, 2016, the Joint Underwriting Association maintained a surplus of approximately $268,124,500. (See id. ¶ 115; Doc. 63 ¶ 32; Doc. 65 ¶¶ 23, 30).

### B. Act 85 of 2016

On July 13, 2016, Governor Wolf signed into law Act 85 of 2016, P.L. 664, No. 85 ("Act 85"). Act 85 is wide-ranging in scope, but its principal effect was to amend the General Appropriation Act of 2016 and balance the Commonwealth's budget. Act 85, § 1. Among other things, Act 85 provides for certain transfers to the Commonwealth's General Fund. See id. § 1(7). Pertinent *sub judice*, Section 18 of Act 85 amends the Commonwealth's Fiscal Code to require a $200,000,000 transfer to

the General Fund from the Joint Underwriting Association. The relevant language states:

> Notwithstanding Subchapter C of Chapter 7 of [the MCARE Act], the sum of $200,000,000 shall be transferred from the unappropriated surplus of the Pennsylvania Professional Liability Joint Underwriting Association to the General Fund. The sum transferred under this section shall be repaid to the Pennsylvania Professional Liability Joint Underwriting Association over a five-year period commencing July 1, 2018. An annual payment amount shall be included in the budget submission required under Section 613 of the Act of April 9, 1929 (P.L. 177, No. 175), known as the Administrative Code of 1929.

Id. § 18 (codified prior to repeal at 72 PA. STAT. & CONS. STAT. ANN. § 1726-C).

The Association did not transfer funds to the Commonwealth pursuant to Act 85. (Doc. 60 ¶ 96). On May 18, 2017, the Association commenced a lawsuit—also pending before the undersigned—challenging the constitutionality of Act 85. See Pa. Prof'l Liab. Joint Underwriting Ass'n v. Albright, No. 1:17-CV-886, Doc. 1 (M.D. Pa.). The lawsuit names as the sole defendant Randy Albright in his capacity as the Commonwealth's Secretary of the Budget. Id., Doc. 12. Secretary Albright moved to dismiss the Association's complaint on August 22, 2017. Id., Doc. 14. That motion is held in abeyance pending resolution of the Association's claims herein.

## C.     Act 44 of 2017

Governor Wolf signed Act 44 into law on October 30, 2017, in another attempt to bring balance to the state budget. Act 44, § 1. Therein, the General Assembly expressly repeals Act 85. Id. § 13. Act 44, *inter alia*, amends the Fiscal

Code to include certain "findings" concerning the Joint Underwriting Association's relationship to the Commonwealth and the nature of its unappropriated surplus.

Id. § 1.3. The General Assembly in Act 44 specifically "finds" as follows:

> (1) As a result of a decline in the need in this Commonwealth for the medical professional liability insurance policies offered by the joint underwriting association under Subchapter B of Chapter 7 of the MCARE Act, and a decline in the nature and amounts of claims paid out by the joint underwriting association under the policies, the joint underwriting association has money in excess of the amount reasonably required to fulfill its statutory mandate.

> (2) Funds under the control of the joint underwriting association consist of premiums paid on the policies issued under Subchapter B of Chapter 7 of the MCARE Act and income from investment. The funds do not belong to any of the members of the joint underwriting association nor any of the insureds covered by the policies issued.

> (3) The joint underwriting association is an instrumentality of the Commonwealth. Money under the control of the joint underwriting association belongs to the Commonwealth.

> (4) At a time when revenue receipts are down and the economy is still recovering, the Commonwealth is in need of revenue from all possible sources in order to continue to balance its budget and provide for the health, welfare and safety of the residents of this Commonwealth.

> (5) The payment of money to the Commonwealth required under this article is in the best interest of the residents of this Commonwealth.[3]

---

[3] Act 44 twice references Subchapter *B* of Chapter 7 of the MCARE Act in describing the Association's function. The court notes that it is Subchapter *C* of Chapter 7 of the MCARE Act that establishes and defines the Association and its mission. See 40 PA. STAT. & CONS. STAT. ANN. §§ 1303.731-.733.

Id. Following these findings, Act 44 mandates the monetary transfer at the heart of this litigation: "On or before December 1, 2017, the joint underwriting association shall pay the sum of $200,000,000 to the State Treasurer for deposit into the General Fund." Id. Per the Act, the funds shall be appropriated by the General Assembly to the Department of Human Services "for medical assistance payments for capitation plans." Id.

Act 44 contains two additional pertinent provisions. Its "no liability" clause purports to immunize the Association as well as its officers, board of directors, and employees from liability arising from the transfer mandated by Act 44. Id. It also contains a "sunset" clause which threatens to abolish the Association if it fails to meet the Act's demands. Id. Specifically, that clause states that if the Association fails to transfer the $200,000,000 by the Act's deadline, the provisions of the MCARE Act creating it will immediately expire, the Association will be abolished, and its assets will be transferred to the Insurance Commissioner for administration of the Association's functions. Id. Act 44 then directs the Insurance Commissioner to transfer the $200,000,000 for deposit into the Commonwealth's General Fund "as soon as practicable after receipt." Id.

### D.    Procedural History

The Association commenced the instant litigation on November 7, 2017, challenging the constitutionality of Act 44. In its verified complaint, the Association asserts that Act 44 violates the Substantive Due Process Clause, the Takings Clause, and the Contract Clause, as well as the doctrine of unconstitutional conditions. The Association seeks declaratory and injunctive relief pursuant to Section 1983 and the

Declaratory Judgment Act, 28 U.S.C. § 2201. The verified complaint names Tom Wolf, in his official capacity as Governor of the Commonwealth of Pennsylvania, as defendant. With the court's leave, the General Assembly of the Commonwealth of Pennsylvania joined this litigation as intervenor defendant.

The Joint Underwriting Association sought both a temporary restraining order and preliminary injunction. We denied the temporary restraining order but accelerated proceedings on the Association's request for a preliminary injunction. Following extensive briefing by the parties and *amicus*, an evidentiary hearing, and oral argument, we preliminarily enjoined enforcement of Act 44 pending full merits review of the Joint Underwriting Association's claims. Cross-motions for summary judgment by the Joint Underwriting Association, Governor Wolf, and the General Assembly are presently before the court and ripe for disposition.

## II.  **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. Fed. R. Civ. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus.

Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Fed. Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

**III.**   **Discussion**

The Joint Underwriting Association levies a fourfold objection to Act 44 through the prism of Section 1983.  It contends *first*, that Act 44 violates its right to substantive due process; *second*, that Act 44 is an unconstitutional taking of private property; *third*, that Act 44 substantially interferes with the Association's contracts with its insureds and its members; and *fourth*, that Act 44 impermissibly conditions the Association's exercise of constitutional rights.  The Association asks the court to declare Act 44 unconstitutional and permanently enjoin its enforcement.  Our analysis begins and ends with the Association's Takings Clause claim.

**A.**   **The Association's Takings Clause Claim**

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism

for vindicating rights otherwise protected by federal law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  Governor Wolf does not dispute that he is a state actor. We must thus assess whether Act 44 deprives the Association of rights secured by the Fifth Amendment to the United States Constitution.

The Fifth Amendment's Takings Clause prohibits the government from taking private property for public use without just compensation.  U.S. CONST. amend. V.  The Takings Clause is made applicable to the states by the Fourteenth Amendment.  See U.S. CONST. amend. XIV; Murr v. Wisconsin, 582 U.S. __, 137 S. Ct. 1933, 1942 (2017) (citing Chi., B. & Q. R. Co. v. Chicago, 166 U.S. 266 (1897)).  It applies not only to the taking of real property, but also to government efforts to take identified funds of money.  See, e.g., Phillips v. Wash. Legal Found., 524 U.S. 156, 160, 164-65 (1998); Webb's Fabulous Pharms., Inc. v. Beckwith, 449 U.S. 155, 164-65 (1980).  Takings claims generally fall into two categories—physical and regulatory. See Yee v. City of Escondido, 503 U.S. 519, 522-23 (1992).  The Association's claim

concerns an alleged physical taking, to wit: that Act 44 is an unlawful attempt to expropriate $200,000,000 from the Association's private coffers.[4]

Governor Wolf and the General Assembly rejoin that the Association is a creature of statute—a public entity having no constitutional rights against its creator. Defendants alternatively contend, assuming *arguendo* that we deem the Association and its funds to be private in nature, that the Association has no interest in its surplus and, therefore, no "just compensation" is due. Defendants further submit that even if the Association prevails on the merits, it is not entitled to permanent injunctive relief. We address defendants' arguments *seriatim*.

### 1.  *Taking of "Private Property"*

Defendants collectively adjure that the Joint Underwriting Association is a state entity and thus cannot assert a takings claim against the Commonwealth. Their respective positions take several forms. The General Assembly invokes the political subdivision standing doctrine, which originated in <u>Trustees of Dartmouth College v. Woodward</u>, 17 U.S. (4 Wheat.) 518 (1819). Governor Wolf urges the court to look to principles governing state actor liability developed in <u>Lebron v. National</u>

---

[4] Because this case concerns a *per se* physical taking, defendants' reliance on the Third Circuit's decision in <u>American Express Travel Related Services, Inc. v. Sidamon-Eristoff</u> ("<u>Amex</u>"), 669 F.3d 359 (3d Cir. 2012), is misplaced. The court in <u>Amex</u> addressed a regulatory taking—a statutory amendment that retroactively reduced the presumptive abandonment period for unclaimed travelers checks from fifteen to three years. <u>Id.</u> at 364-66. The court opined that "[t]hose who do business in [a] regulated field" cannot claim that a later amendment to the relevant statutory framework "interferes with its investment-backed expectations" as required for a regulatory takings claim. <u>Id.</u> at 371 (quoting <u>Connolly v. Pension Benefit Guar. Corp.</u>, 475 U.S. 211, 227 (1986)). Act 44 is not a regulatory taking. It directly targets and endeavors to take money from the Joint Underwriting Association alone. <u>See</u> Act 44, § 1.3. <u>Amex</u> has no application under these circumstances.

Railroad Passenger Corp., 513 U.S. 374 (1995). Defendants then jointly remonstrate

that, regardless of the doctrine applied, the Association—or at minimum its surplus

funds—are public in nature. We begin with the General Assembly's argument.[5]

### a.      The Association as a "Political Subdivision"

Counties, municipalities, and other subdivisions owing their existence to

the state generally cannot assert constitutional claims against their creator. Trs.

of Dartmouth Coll., 17 U.S. (4 Wheat.) at 660-61. Such entities are creatures of the

state, developed "for the better ordering of government." Williams v. Mayor of

Balt., 289 U.S. 36, 40 (1933) (collecting cases). A political subdivision accordingly

"has no privileges or immunities under the Federal Constitution which it may

invoke in opposition to the will of its creator." Id. The doctrine applies equally to

all of a state's "political subdivisions," barring any federal claim against the state

thereby. Williams v. Corbett, 916 F. Supp. 2d 593, 598 (M.D. Pa. 2012) (citations

---

[5] Preliminarily, the General Assembly asserts that Act 44's *ipse dixit* statement that the Association is an "instrumentality" of the Commonwealth is enough to make it so. We rejected this argument in our preliminary injunction opinion, (see Doc. 41 at 22), and we reject it again now. The General Assembly's citation to Harristown Development Corp. v. Commonwealth, 614 A.2d 1128 (Pa. 1992), does not persuade us otherwise. The legislature invokes Harristown for the Pennsylvania Supreme Court's statement that an entity "is an agency if the General Assembly says it is." (Doc. 71 at 2-3 (quoting Harristown, 614 A.2d at 1131)). This selective quotation of Harristown divorces the decision from critical context. The plaintiff in Harristown sought declaratory judgment that the state could not apply open records and open meetings laws to it based solely on the volume of business it did with the state. Id. at 1129-31. The court determined that the General Assembly could define "agency"—"*as that term appears in the Sunshine Act and the Right to Know Law*"—as it saw fit. Id. (emphasis added). No court has extended the quoted passage from Harristown beyond its open records and open meetings context.

omitted), aff'd *sub nom.* Williams v. Gov. of Pa., 552 F. App'x 158 (3d Cir. 2014) (nonprecedential).

The General Assembly recognizes that the Joint Underwriting Association is not a political subdivision in the usual sense. (See Doc. 62 at 8-11; Doc. 71 at 12-14). It nonetheless maintains that the doctrine is "not *limited* to municipalities and subdivisions" and in fact extends to *any* state-created entity. (Doc. 62 at 9-10). The General Assembly is correct that, in appropriate circumstances, courts apply the doctrine to bar Section 1983 suits by entities similar in kind to traditional political subdivisions. See Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist., 908 F. Supp. 2d 597, 606-14 (M.D. Pa. 2012); see also Palomar Pomerado Health Sys. v. Belshe, 180 F.3d 1104, 1107-08 (9th Cir. 1999).[6] None of these cases supports the General Assembly's suggestion that the Commonwealth is insulated from suit by *any* entity it creates.

The central inquiry in the cases cited by the General Assembly is whether a relationship between plaintiff and defendant is "sufficiently analogous" to that between a state and its municipalities. In Pocono Mountain, for example, the court held that the link between a public charter school and its chartering public school district was sufficiently similar to that between a municipality and the state for

_____

[6] Both the General Assembly and Governor Wolf also identify the Eleventh Circuit's decision in United States v. State of Alabama, 791 F.2d 1450 (11th Cir. 1986), as a bar to the Association's lawsuit. In State of Alabama, the Eleventh Circuit Court of Appeals opined without analysis that the political subdivision standing doctrine applicable to cities and counties "extends logically to other creatures of the state such as state universities." Id. at 1456. This thin holding concerning an indisputably public university offers precious little insight to aid our analysis of a private nonprofit's relationship to the state.

purposes of barring the charter school's Section 1983 lawsuit against the district. Pocono Mountain, 908 F. Supp. 2d at 611. In addition to the formation component, the court noted the school district's narrow circumscription of the charter school's authority, highlighting the degree of control reserved by the district, as well as the charter school's inherently municipal function. Id. at 611-12. Courts consistently apply Pocono Mountain to foreclose charter schools' suits against their chartering school districts. See, e.g., I-Lead Charter Sch.-Reading v. Reading Sch. Dist., No. 16-2844, 2017 WL 2653722, at *3-4 (E.D. Pa. June 20, 2017), appeal filed, No. 17-2570 (3d. Cir.); Reach Acad. for Boys & Girls, Inc. v. Del. Dep't of Educ., 8 F. Supp. 3d 574, 578 (D. Del. 2014). But no case has extended Pocono Mountain beyond its charter school context.

The General Assembly's reliance on Palomar is farther afield. Indeed, Palomar supports the Association's position that the political subdivision standing doctrine should *not* apply to it. Palomar involved a health care district established by a California statute as a "public corporation." Palomar, 180 F.3d at 1107. The district was imbued by statute with distinctly governmental functions. See id. at 1107-08. For example, the state statutorily authorized the district to levy taxes and issue bonds. Id. at 1107. The state also granted to the health care district the power of eminent domain. Id. The Ninth Circuit Court of Appeals had no difficulty determining that the health care district was a political subdivision of the state. Id. at 1108.

The Joint Underwriting Association is neither a political subdivision nor "sufficiently analogous" to one for Section 1983 purposes. The Association is not

empowered with governmental authority: it has no power, for example, to tax, to issue bonds, or to exercise eminent domain. Its mission, while beneficial to the public, is inherently nongovernmental. In the vernacular, it is an insurance business, possessing none of the traditional characteristics of a political subdivision. We are also cognizant that the Third Circuit has observed that support for the political subdivision doctrine "may be waning with time." Amato v. Wilentz, 952 F.2d 742, 755 (3d Cir. 1991). For all of these reasons, we decline the General Assembly's invitation to declare the nonprofit Joint Underwriting Association a "political subdivision" of the Commonwealth.

### b. The Association as the "Government Itself"

Governor Wolf's reliance on Lebron fares no better. The Supreme Court in Lebron supplied "guideposts" for federal courts to assess whether a defendant is a government actor subject to Section 1983 liability. See Sprauve v. W. Indian Co., 799 F.3d 226, 229-30 (3d Cir. 2015) (citing Lebron, 513 U.S. 374). Lebron sued the National Railroad Passenger Corporation, widely known as "Amtrak," alleging that Amtrak's rejection of his political billboard display violated the First Amendment. See Lebron, 513 U.S. at 376-77. Tasked to decide whether Amtrak was a proper Section 1983 defendant, the Supreme Court bypassed traditional analyses concerning whether and when private action is attributable to the state and instead asked whether Amtrak was itself a "government entity," and thus a "state actor" for purposes of Section 1983. See id. at 378, 383, 394-400.

The Court jettisoned Amtrak's assertion that its enabling statute—which disclaimed it as a federal agency—was dispositive. Id. at 392-93. Concluding that Amtrak was in fact a government entity subject to Section 1983 liability, the Court underscored two factors: *first*, that Amtrak was "established by a special statute for the purpose of furthering governmental goals," and *second*, that Amtrak was subject to extensive governmental control. See Sprauve, 799 F.3d at 231 (citing Lebron, 513 U.S. at 397-98). The Court found an "important measure of control" to be the fact that "a majority of the governing body of the corporation was appointed by the federal or state government." See id. To find that Amtrak was not a state actor, the Court concluded, would be to allow the government "to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." Lebron, 513 U.S. at 397.

As a threshold matter, an essential aspect of Lebron—that the federal government "retain[ed] for itself permanent authority to appoint a majority of [Amtrak's] directors," Lebron, 513 U.S. at 400—is indisputably lacking *sub judice*. More importantly, application of Lebron to the Association would betray the Court's *ratio decidendi*. The Court sought to ensure that government could not shirk constitutional *liability* by delegating its legislative prerogatives to a private corporate entity. Governor Wolf rejoins that whether a party asserts or disclaims constitutional liability is "an empty distinction," (Doc. 82 at 3 n.3), but his claim is accompanied by no citation, and the court has separately found no support therefor. Indeed, the only authority exploring Governor Wolf's argument flatly refutes it. See Ill. Clean Energy Comm. Found. v. Filan, 392 F.3d 934, 938 (7th Cir. 2004) (rejecting

state's reliance on <u>Lebron</u> to foreclose takings claim when state demanded that state-authorized trust turn $125 million over to state).  <u>Lebron</u> has no application in this posture.[7]

### c.  <u>The Association as a "Public Entity"</u>

We thus come to the *essentia* of defendants' argument: that the Joint Underwriting Association is nonetheless a public "entity" or "instrumentality" and cannot state a constitutional claim against the Commonwealth.  Fortunately, in resolving this question, we do not write upon a blank slate.  The Association is not the only state-created insurer-of-last-resort.  Nor is the Association the first state-affiliated insurer to resist state action impacting its constitutional rights.  As is often the case, examples are our best teachers.  <u>See</u> <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 296 (2001).

---

[7] For the same reason, we reject the General Assembly's repeated reliance on Justice Ginsburg's majority opinion in <u>Hess v. Port Authority Trans-Hudson Corp.</u>, 513 U.S. 30 (1994), and Justice Brennan's concurrence in <u>Port Authority Trans-Hudson Corp. v. Feeney</u>, 495 U.S. 299 (1990).  This pair of cases concerns the amenability of the Port Authority Trans-Hudson Corporation ("PATH"), a bistate railway created under the Constitution's Compact Clause, to suit in federal court.  Both opinions express the unremarkable maxim that "ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates."  <u>Hess</u>, 513 U.S. at 47; <u>see also</u> <u>Feeney</u>, 495 U.S. at 313 (Brennan, J., concurring) (noting that "political subdivisions exist solely at the whim and behest of their State").  The Justices make this point, however, in the context of explaining that such ultimate authority—which is true of *any* state-created entity—renders state control nondispositive to an Eleventh Amendment inquiry.  <u>See</u> <u>Hess</u>, 513 U.S. at 47-48; <u>Feeney</u>, 495 U.S. at 313 (Brennan, J., concurring) (observing that political subdivisions are too far removed from the state to receive Eleventh Amendment protection "*even though* these political subdivisions exist solely at the whim and behest of their State" (emphasis added)).  The General Assembly's theory that state creation is determinative finds no support in <u>Hess</u> or <u>Feeney</u>.

### i.     The Jurisprudential Landscape and
###        Characteristics Examined

Defendants insist that we need not look beyond the fact of state creation
to define the Joint Underwriting Association's relationship with the state.  But
for all of the ink spilled on the issue, neither defendant identifies a single decision
that turns *exclusively* on the fact that an association was created by statute.  Our
research reveals no support for this uncritical proposition.  *Per contra*, at least two
federal courts have rejected defendants' position.

The First Circuit Court of Appeals, for example, dismissed the
Commonwealth of Puerto Rico's contention that Puerto Rico's joint underwriting
association, being "a state-created entity," lacked standing to challenge actions
taken by its creator.  See Asociacion de Subscripcion Conjunta del Seguro de
Responsibilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 20 (1st Cir. 2007).  The
court in Asociacion relied on an earlier First Circuit decision that expounded the
nature of the association's relationship with the government.  Id. (citing Arroyo-
Melicio v. Puerto Rican Am. Ins. Co., 398 F.3d 56, 62 (1st Cir. 2005)).  The court
underscored several factors, to wit: that the association's members, not the
government, shared in its profits and losses; that the association, through its
members, bore the risk of insuring Puerto Rico's high-risk drivers; that the
association managed its own day-to-day affairs; that it had "general corporate
powers" to sue and be sued, enter contracts, and hold property; and that it was
designated by statute as "private in nature, for profit," and subject to Puerto Rico's
insurance code.  See Arroyo-Melicio, 398 F.3d at 61-63.

The court found that the association was not a public entity, even though it was "under some direction by the Commonwealth." Asociacion, 484 F.3d at 20 (quoting Arroyo-Melicio, 398 F.3d at 62). Indeed, the court acknowledged that the legislature created the association, dictated its form and purpose, offered tax exemptions to compensate for the association's assumption of public risks, and held approval power over the association's plan of operations. See Arroyo-Melicio, 398 F.3d at 61-63. On balance, the association and its funds were overwhelmingly "private in nature," id. at 62, and the association was held to be a proper Section 1983 plaintiff. See Asociacion, 484 F.3d at 20 (citing Arroyo-Melicio, 398 F.3d at 62).

The Fifth Circuit Court of Appeals reasoned similarly in finding that the Texas Catastrophe Property Insurance Association had standing to sue the state attorney general under Section 1983. Tex. Catastrophe Prop. Ins. Ass'n v. Morales, 975 F.2d 1178, 1181-83 (5th Cir. 1992). The state of Texas established the association as an assigned risk pool to write windstorm, hail, and fire insurance policies in parts of the state, and required all property insurers to join as a condition of operating in Texas. Id. at 1179. The association wrote its own policies and paid its own claims, which were funded first by policyholder premiums and, as needed, from member assessments. Id. The state subsidized the association's losses with tax credits. Id. Its plan of operations was adopted by the state's board of insurance with input from the association's board of directors, a majority of which was comprised of member company representatives. Id. The association's board was statutorily "responsible and accountable" to the state's board of insurance. Id.

The association hired its own legal counsel for decades. Id. at 1179-80. The legislature eventually amended the relevant statute to proclaim that the association "is a state agency" and to require the association to use the state's attorney general for legal representation. Id. at 1180. When the association brought suit claiming a violation of its right to counsel, the attorney general rejoined that the association, as a creature of statute, is necessarily "a state agency" with no constitutional rights as against its creator. Id. at 1180, 1181. The Fifth Circuit disagreed. It emphasized that the state government did not contribute to the association, nor did it share in the association's losses, which were borne by the association's members alone. Id. The association's monies, in sum, were wholly private—"private money directed to pay private claims." Id. at 1183. The court observed that although the state could deprive *itself* of any constitutional right it chooses, the association was not "truly a part of the state" for that purpose. Id.

The General Assembly directs the court to two cases that reached a contrary result. The first originates from the same medical malpractice insurance crisis from which the Joint Underwriting Association arose. See Med. Malpractice Ins. Ass'n v. Superintendent of Ins. of State of N.Y., 533 N.E.2d 1030, 1031 (N.Y. 1988) ( "MMIA"), cert. denied, 490 U.S. 1080 (1989). New York state created the Medical Malpractice Insurance Association, a nonprofit unincorporated association, to offer insurance that was "no longer readily available in the voluntary market." Id. The association was governed by an exhaustive statutory framework dictating the composition of its board and its plan of operation and authorizing the superintendent of insurance to unilaterally order amendments to the plan. See MCKINNEY'S INSURANCE LAW

§§ 5503, 5508 (1988).  When the superintendent set new rates that would require the association to operate at a loss, the association challenged the reasonableness of his approach.  MMIA, 533 N.E.2d at 1032.  Pertinent here, the association complained that the rate change effected a "confiscatory" taking in violation of the state and federal constitutions.  See id. at 1032-33.

The New York Court of Appeals dismissed the association's argument in short order.  The court stated that the association "is a creature of statute, and all of its rights, obligations and duties have been defined by the Legislature."  Id. at 1036.  It noted that the statute authorized the association to operate only during "fixed periods of time" as the superintendent deemed necessary.  Id.  And it emphasized that the association's operations were "subject to the [s]uperintendent's extensive and direct control."  Id.  The court further noted that the association was separate and distinct from its members and held and invested its funds separately from its members.  Id. at 1037.  The court accordingly rejected the association's claim that the superintendent's actions were confiscatory.  Id. at 1036-37.  In a later decision, the same court held that, based on its decision in MMIA, the state could order the association to transfer its reserve funds without implicating the Takings Clause.  See Med. Malpractice Ins. Ass'n v. Cuomo, 541 N.E.2d 393, 393-94 (N.Y. 1989).

The General Assembly also identifies as support the Fifth Circuit's unpublished decision in Mississippi Surplus Lines Association v. Mississippi, 261 F. App'x 781 (5th Cir. 2008), aff'g 442 F. Supp. 2d 335 (S.D. Miss. 2006) ("MSLA").  Mississippi's insurance law required the state's insurance commissioner to regulate all insurance companies doing business in the state, including unlicensed "surplus

lines insurers." Id. at 783.  The commissioner was tasked to determine whether

these insurers met various requirements of state law, to review applications and

collect fees from agents seeking to place insurance with those insurers, to review

biannual surplus lines premium reports, and to collect a premium tax on all surplus

lines premiums received.  Id.

The statute permitted the commissioner to delegate its surplus lines

responsibilities to a "duly constituted association of surplus lines agents," and to

allow the association to levy a one percent examination fee on the insurers for its

services.  Id.  The commissioner did so, asking a group of "private individuals" to

form a nonprofit to "assist him with his duties," and the Mississippi Surplus Lines

Association was born.  Id. at 784.  The association collected the examination fees

as authorized by statute and invested the surplus.  See id.  In response to budget

shortfalls several years later, the legislature amended the statute and ordered the

association to transfer $2 million of the fee surplus to the insurance department for

eventual transfer to the state's budget fund.  Id.  The association sued, challenging

the amendment as an unconstitutional taking.  Id.

The Fifth Circuit panel looked to both the nature of the association and the

nature of its funds before concluding that both were "public in nature."  Id. at 785.

The court acknowledged that the association had some private features—noting, for

example, that the association hired its own employees and bore its own losses—but

found that the association did not have "overwhelmingly private characteristics"

sufficient to establish it as a private entity.  Id. at 785-86.  In particular, the court

observed that the association's mission was "wholly to serve the state" and that it "operate[d] under conditions imposed by state law." Id. at 786. The court further concluded that the funds in question were public monies, having been accrued as a direct result of an explicit statutory provision authorizing collection of the fees and for the "sole purpose" of supporting the insurance commissioner's work. Id. at 786-87. The court contrasted the association's funds with those at issue in Morales, finding that the latter were appropriately deemed private funds where premiums paid into the risk pool "had a private end use—insuring businesses against risk and paying those businesses' claims." Id. at 787 (quoting Morales, 975 F.2d at 1183).

### ii. Characteristics of the Joint Underwriting Association and Its Funds

The General Assembly posits that several features distinguish this case from Asociacion and Morales and align it with MMIA and MSLA. It contends that, in the former cases, the members' financial interests were implicated by the legislatures' actions, whereas the Joint Underwriting Association's members share neither in its profits nor its losses. (Doc. 71 at 9-10 & n.6). It also holds up as conclusive that the enabling statute for Puerto Rico's joint underwriting association explicitly identified the association as "private" and "for profit." (Id. at 9-10). We agree with the General Assembly's assertion that these facts differentiate the instant case from Asociacion and Morales. But we disagree with the General Assembly's assertion that these factual distinctions are dispositive.

No decision cited by the General Assembly supports its contention that an entity's public or private status turns on for-profit versus nonprofit nature or a statutory designation. Nor has any court suggested, as the state legislature intimates, that the fact of state creation (and the attendant possibility of state abolition) is alone determinative. Instead, all courts facing our present inquiry have holistically examined the entity's relationship with the state. See Asociacion, 484 F.3d at 20 (adopting Arroyo-Melicio, 398 F.3d at 60-63); Morales, 975 F.2d at 1181-83; MSLA, 261 F. App'x at 784-86; MMIA, 533 N.E.2d at 1031, 1036-37. These courts have considered a variety of factors, including the nature of the association's function, the degree of control reserved in the state (or the level of autonomy granted to the association), and the statutory treatment, if any, of the entity, in addition to the nature of the funds implicated. Viewed through this prism, we are compelled to find that the Joint Underwriting Association is a private entity as a matter of law.

The Association's function is inherently private. It is, at its core, an insurance company. The Association is comprised of private insurer members, governed by a private board, and supported by private employees. It is funded by privately-paid premiums and is tasked to provide medical malpractice coverage to private persons practicing medicine within the Commonwealth. It does not "exist wholly to serve the State," nor is it engaged in work otherwise tasked by statute to the state's insurance commissioner. Cf. MSLA, 261 F. App'x at 785-86. That the Association's private operations work an incidental public benefit does not render its function a public one.

The Association is subject to *de minimis* Commonwealth supervision, and its statutory treatment indicates that the Association is private rather than public. *In toto*, three statutory sections are dedicated to the Association.  See 40 PA. STAT. & CONS. STAT. ANN. §§ 1303.731-.733.  The first "establishe[s]" the Association as a nonprofit, sets forth "duties" largely applicable to all insurers, and defines its membership to include all insurers writing medical malpractice insurance within the state.  Id. § 1303.731(a)-(b).  It also disclaims Commonwealth responsibility for the Association's debts and liabilities.  See id. § 1303.731(c).  The second section describes the particular type of insurance to be offered—medical professional liability insurance for providers and entities otherwise unable to obtain coverage at reasonable rates.  Id. § 1303.732(a).  It sets forth broad-based policy objectives to that end, *i.e.*: that coverage be "conveniently and expeditiously available," and that the Association "provide[] sufficient coverage" on "reasonable and not unfairly discriminatory terms."  Id. § 1303.732(b).  Its third and final provision requires the Association's board to file any deficit with the Commissioner for approval before borrowing funds to satisfy the deficit.  Id. § 1303.733.

Defendants' assertion that the statute subjects the Association to imperious control is belied by the statutory language and the record.  The statute merely states that the Association is "supervised" by the Commissioner.  Id. § 1303.731(a). But the Commissioner wields regulatory authority over all Commonwealth insurers, and the MCARE Act does not articulate a uniquely prescriptive role for the Commissioner in overseeing the Joint Underwriting Association.  To the contrary,

the Act grants nearly unfettered autonomy to the Association's board—all of its "powers and duties" are "vested in and [to be] exercised by a board of directors." Id.  Importantly, the statute is silent as to the composition or operations of the board.  Cf. MMIA, 533 N.E.2d at 1036-37.  Board composition is instead defined by the Association's plan of operations, which provides for a board of directors comprised predominantly of representatives elected by the Association's members. See *supra* at p. 6; (see also Doc. 60 ¶ 45).

The General Assembly asserts that the MCARE Act ties the Association's hands with respect to a key function—setting its rates.  The statute does require the Association to submit its rates and any rate modification to the Department for approval—in accordance with rate-setting provisions applicable equally to every insurer in the Commonwealth.  40 PA. STAT. & CONS. STAT. ANN. § 1303.731(b)(2) (incorporating 40 PA. STAT. & CONS. STAT. ANN. §§ 1181-99).  The legislature also argues that the Commissioner holds "revisionary power" over the Association's rates and can "unilaterally 'adjust [the JUA's] prevailing primary premium.'"  (Doc. 71 at 19 (quoting 40 PA. STAT. & CONS. STAT. ANN. § 1303.712(f))).  This assertion is simply incorrect.  The provision the legislature cites concerns the Commissioner's authority to determine the *MCARE assessment* levied on each health care provider in the state.  40 PA. STAT. & CONS. STAT. ANN. § 1303.712(d), (f).  That assessment is calculated based upon the "prevailing primary premium" submitted for approval by the Association.  Id.  The statute permits the Commissioner to adjust the prevailing

primary premium for the purpose of calculating MCARE assessments; it does not authorize the Commissioner to unilaterally reset the Association's rates. See id. § 1303.712(f).

Both defendants asseverate that the Association may be dissolved "by operation of law," positing that this "alone, establishes absolute governmental control." (Doc. 66 at 19-20; see also Doc. 62 at 7-9). Preliminarily, it is not the MCARE Act but the Association's own plan of operations, developed by the board with the Commissioner's approval, which sets procedures for dissolution. The Act's silence on this point hardly indicates legislative intent to retain control over the Association. Moreover, neither defendant identifies support for the claim that the state's ability to dissolve a nonprofit confers total control thereof to the state. Nor could they. *Any* nonprofit in the Commonwealth may be dissolved by operation of law. See 15 PA. CONS. STAT. § 9134(a)(5) ("A nonprofit association may be dissolved . . . under law other than this chapter."). The Commissioner also has the authority to dissolve private insurers in the Commonwealth under certain circumstances, and even private insurers must secure Commissioner approval to voluntarily dissolve. See 15 PA. STAT. & CONS. STAT. ANN. § 21205(a); 40 PA. STAT. & CONS. STAT. ANN. §§ 221.1-.52. Surely, these provisions do not divest all such entities of their constitutional rights anent the Commonwealth.

The MCARE Act meaningfully circumscribes the Association's authority in only two ways: by requiring it to file any deficit with the Commissioner for approval thereby to borrow funds, see id. § 1303.733, and by subjecting its plan

of operations to Commissioner approval, see id. § 1303.731(b)(1). These provisions are similar in kind to those applicable to other insurers: all insurers in the Commonwealth, for example, are subject to some level of Department review in the event of severe financial impairment, see 40 PA. STAT. & CONS. STAT. ANN. §§ 221.6-a to -221.9-a, and all insurers must submit material amendments to their articles of incorporation, including proposed changes to the scope of their business, to the Department for approval, see 15 PA. STAT. & CONS. STAT. ANN. § 21204. With minor and immaterial exceptions, the Joint Underwriting Association is no more closely managed by the Commonwealth than any other private insurer authorized to write insurance in the state.

We must also consider the nature of the funds in dispute. See MSLA, 261 F. App'x at 785, 786-87. The General Assembly likens the Association's surplus to the fees collected on the commissioner's behalf in MSLA, positing that the surplus here, too, was "collected under the auspices of the state for the purpose of funding MSLA's operation on behalf of the state." (See Doc. 62 at 15 (quoting MSLA, 442 F. Supp. 2d at 344)). Beyond this selective quotation, the General Assembly finds no footing in MSLA. The court in MSLA distinguished the case before it—which concerned fees collected by a nonprofit association performing the commissioner's statutory duties—from Morales—where a nonprofit association offered catastrophe insurance at the direction of the legislature. MSLA, 261 F. App'x at 787 (citing Morales, 975 F.2d at 1179, 1183). The funds in the former case had a "public end use" and were not private property for Fifth Amendment purposes. Id. The latter,

however, were indisputably private—"[i]t was private money directed to pay private claims," and thus "had a private end use—insuring businesses against risk and paying those businesses' claims." Id. So too is it here.

The Association has never received Commonwealth funding. The only provision of the MCARE Act that concerns the Association's finances *distances* the Commonwealth therefrom, expressly disclaiming state responsibility for the Association's debts and liabilities. 40 PA. STAT. & CONS. STAT. ANN. § 1303.731(c). The Association is funded exclusively by private premiums—paid by private parties in exchange for private insurance coverage—and any interest generated on those premiums. As a nonprofit association, Pennsylvania law authorizes the Association to "acquire, hold[,] or transfer . . . an interest in" the funds, see 15 PA. CONS. STAT. § 9115(a), and to "use[] or set aside" those funds "for the nonprofit purposes" of the Association, see id. § 9114(d). We find that the Association's surplus is the private property of the Association.

Defendants lastly contend that the surplus will inevitably escheat to the state. Specifically, the General Assembly avers that it could dissolve the Association by statute and order the Commissioner to refuse any proposed distribution of assets offered by the Association's board. (Doc. 62 at 17-18; see Doc. 73 at 19, 22 n.8). It submits that, in this scenario, the Association's assets would sit "unclaimed" until the funds escheat to the state by operation of law. (Doc. 62 at 17-18). This argument rests on several assumptions: *first*, that the General Assembly succeeds in passing a law to dissolve the Association, and, *second*, that the Commissioner rejects every

proposed asset distribution submitted by the board. The General Assembly further assumes, without explanation, that the hierarchical statutory windup framework governing nonprofit dissolution "does not otherwise apply" to justify its invocation of the last-resort escheat alternative. (Id. at 17). We find no merit in this argument. Moreover, even if the legislature's hypothetical actualized in the future, it would not deprive the Association of its *present* possessory right in the surplus.

The Joint Underwriting Association is created by statute. But in the same legislation that created the Association, the General Assembly relinquished control thereof, for all material intents and purposes, to the Association's board of directors. The legislature had the option to tightly circumscribe the Association's operations and composition of its board, cf. MMIA, 533 N.E.2d at 1036-37 (citing McKinney's Insurance Law § 5501 *et seq.*); to establish the Association as a special fund within the state's treasury, cf. 40 Pa. Stat. & Cons. Stat. Ann. § 1303.712(a); or to retain meaningful control in any number of other ways. That the General Assembly chose to achieve a public health objective through a private association has a perceptible benefit: it assures availability of medical professional liability coverage throughout the Commonwealth at no public cost. By the same token, it also has a consequence: the General Assembly cannot claim *carte blanch* access to the Association's assets. We hold that the Joint Underwriting Association is a private entity, and its surplus funds are private property. The Commonwealth cannot take those funds without just compensation.

### 2. *For "Public Use" and Without "Just Compensation"*

We turn to the final two elements of the Joint Underwriting Association's takings claim: that the private property is taken "for public use" and "without just compensation." U.S. CONST. amend. V. The parties do not dispute that Act 44 seeks to repurpose the Association's surplus for public use. The General Assembly will utilize the funds to remedy the Commonwealth's budget deficits. See Act 44, § 1.3(4). Act 44 explains that the state "is in need of revenue from all possible sources in order to continue to balance its budget and provide for the health, welfare and safety of the residents of this Commonwealth." Id. In pursuit of this objective, the General Assembly earmarks the anticipated transfer "for medical assistance payments for capitation plans." Id. Act 44 thus purports to take the surplus funds for "public use."

There is also no genuine dispute that Act 44 fails to provide "just compensation" for its *per se* taking of the Association's funds. U.S. CONST. amend. V. In determining what compensation the Constitution requires, we examine not the value gained by the government but the loss to the property owner. See Brown v. Legal Found. of Wash., 538 U.S. 216, 235-36 (2003) (quoting Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195 (1910)). For this reason, the Supreme Court has long held that "even if there was technically a taking" of private property, there can be no recovery under the Fifth Amendment when "nothing of value" is taken from the property owner. Marion & Rye Valley Ry. Co. v. United States, 270 U.S. 280, 254-55 (1926).

The General Assembly intimates that the Joint Underwriting Association cannot prevail on its takings claim because it will not "actually *feel* . . . pain" from the forced transfer of $200,000,000 of its surplus. (Doc. 71 at 20-21). It submits that the funds subject to Act 44 constitute "excess" surplus which is both unnecessary to preserve the Association's insurance function and is unable to be put to other use given the Association's narrow nonprofit purpose. (See id.) In other words, the General Assembly posits that because the Joint Underwriting Association has not identified a present need or intended use for the $200,000,000 subject to Act 44, the Fifth Amendment requires no compensation for the Act's proposed transfer thereof.

The parties dispute whether the $200,000,000 targeted by Act 44 is in fact "excess" surplus. Competing expert reports debate this question at length. This dispute, genuine though it may be, is ultimately immaterial. Even if the surplus funds are "excess" and unnecessary to maintain the Association's solvency in a forthcoming hard market, the funds remain the private property of the Association. Pennsylvania law firmly establishes that profits earned by a nonprofit association may "be used or set aside for the nonprofit purposes" thereof. See 15 PA. CONS. STAT. § 9114(d). Neither defendant identifies authority supporting their self-serving proposition that the Association's failure to identify a present purpose for the funds dilutes the value thereof to zero. Nor is there any support for Governor Wolf's view that, because the Association cannot articulate an immediate plan for divesting of its surplus, the General Assembly is free to take those funds for use toward what it deems a better purpose. (See Doc. 73 at 22-23). Accordingly, we reject defendants' claim that the $200,000,000 surplus targeted by Act 44 is "valueless."

There are no genuine disputes of material fact *sub judice*. The Rule 56 record leads inescapably to the following conclusions. The Joint Underwriting Association is a private entity, and monies in its possession are private property. Act 44 endeavors to take a substantial portion of these funds—$200,000,000—for the public purpose of remedying longstanding imbalances in the Commonwealth's budget. Act 44 not only fails to provide "just" compensation; it fails to provide *any* compensation whatsoever. We find Act 44 to be an unconstitutional taking of private property in contravention of the Fifth Amendment to the United States Constitution.

### B. Permanent Injunctive Relief

Our inquiry does not end with a determination that the Joint Underwriting Association has prevailed on the merits of its Fifth Amendment claim. Before the court may grant permanent injunctive relief, the Association must prove: *first*, that it will suffer irreparable injury absent the requested injunction; *second*, that legal remedies are inadequate to compensate that injury; *third*, that balancing of the respective hardships between the parties warrants a remedy in equity; and *fourth*, that the public interest is not disserved by an injunction's issuance. See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006) (citations omitted).

We have already determined that the constitutional injury effected by Act 44 is irreparable. (See Doc. 41 at 25). Sovereign immunity forecloses an award of monetary damages against the Commonwealth in this litigation. See Edelman v. Jordan, 415 U.S. 651, 663 (1974); Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 319 (3d Cir. 2013). We reject the General

Assembly's eleventh hour suggestion that we allow the unconstitutional taking to occur and force the Association to try its luck in state court. (See Doc. 62 at 33-34). For the same reason, we find that there is no adequate legal remedy to compensate plaintiff's injury. The Third Circuit Court of Appeals has explicitly stated that "the Eleventh Amendment bar to an award of retroactive damages against the Commonwealth clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature." Temple Univ. v. White, 941 F.2d 201, 214-15 (3d Cir. 1991). A combination of declaratory and injunctive relief is the only way to ensure that the Association does not suffer an irreparable injury.

The remainder of the factors also favor the Association's request. Act 44 effects a direct loss of $200,000,000 to the Association as well as the indirect loss of both the interest on those funds and the cost of liquidating its investment portfolio. It inflicts a considerable and irreparable constitutional injury which far surpasses the General Assembly's frustration in returning to the budgetary drawing board. As concerns the public interest, we do not doubt that the General Assembly's intention was as stated—to achieve the estimable goals of balancing the state's budget and providing "for the health, welfare and safety of the residents of this Commonwealth." Act 44, § 1.3. As we have already held, the General Assembly cannot achieve this legitimate end through illegitimate means. (See Doc. 41 at 26-27). The public interest is furthered—not disserved—by permanently enjoining enforcement of a plainly unconstitutional statute. See Jamal v. Kane, 105 F. Supp. 3d 448, 463 (M.D. Pa. 2015) (Conner, C.J.). We will grant the Association's request for permanent injunctive relief.

## IV.    Conclusion

Through Act 44, the General Assembly attempts to take by legislative requisition the private property of a private association to remedy its perpetual budgeting inefficacies.  This it cannot do.  Act 44 is plainly violative of the Takings Clause of the Fifth Amendment to the United States Constitution.  We will grant summary judgment, declaratory judgment, and permanent injunctive relief to the Joint Underwriting Association.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    May 17, 2018